# In the United States District Court for the Southern District of Georgia Waycross Division

BFS RETAIL & COMMERCIAL :   CIVIL ACTION
OPERATIONS, LLC

  :

  Plaintiff,

  :

  v.

  :

TONY HARRELSON

  :

  Defendant.   :   NO. CV507-032

## ORDER

On December 1, 2008, after a trial, the jury in the above-captioned case returned a verdict in favor of Plaintiff, BFS Retail & Commercial Operations, LLC, and against Defendant, Tony Harrelson, in the amount of $518,596.00. Doc. No. 58. Presently before the Court is Defendant's motion for a new trial. Doc. No. 62. For the reasons set forth below, Defendant's motion will be **DENIED**.

## BACKGROUND

Plaintiff BFS Retail & Commercial Operations, LLC (hereinafter "BFS") filed suit against Defendant Tony Harrelson on April 6, 2007. In its complaint, BFS alleged

that while Harrelson was employed as a store manager at one of BFS' retail tire stores in Waycross, Georgia, Harrelson gave away store inventory without obtaining payment, converted merchandise for his own use without payment, and falsified financial and inventory records in an effort to prevent discovery of his conduct. Complaint ¶¶ 10-12. Doc. No. 1. BFS asserted claims for conversion, fraud, and misfeasance.

Harrelson was represented by an attorney, Terry A. Dillard, from the April 2007 filing of his answer and counterclaim, through the discovery period and the motions period. Harrelson's counsel worked with BFS's counsel to file a proposed pretrial order on March 31, 2008. Each side filed a motion for summary judgment. BFS's motion for summary judgment on Harrelson's counterclaim was granted on September 12, 2008, and Harrelson's motion for summary judgment was denied on the same date. On November 4, 2008, attorney Dillard filed a motion to withdraw as counsel for Harrelson. In granting the motion, the Court reminded Harrelson of the pretrial conference scheduled for November 25, 2008, and the trial scheduled for December 1, 2008. Doc. No. 45. Harrelson chose to proceed pro se. He never requested a delay or continuance.

After both sides were given the opportunity to conduct discovery, and a pretrial conference was held, the case was heard before a jury in Waycross, Georgia on December 1, 2008. After hearing testimony presented by both sides and receiving documentary evidence, the jury returned a verdict in favor of BFS and against Harrelson in the amount of $518,596.00. Doc. No. 58. Immediately after the jury trial was concluded, Harrelson again elected to obtain representation and has been represented ever since the December 2008 filing of the motion for a new trial.

## DISCUSSION

In his motion, Harrelson raises multiple grounds upon which he claims he is entitled to a new trial. According to his present attorney, the "core" of his request for a new trial is his claim that the jury verdict should be disregarded because all of the witnesses listed on Plaintiff's witness list were not present in Court. Harrelson claims that these witnesses were essential to his defense and that he was entitled to rely on their presence. Motion at 1; Transcript of Motion For New Trial Oral Arg. at 6-8. Harrelson also claims that the jury verdict was contrary to the evidence and

lacks proper evidence to support it, was decidedly and strongly against the weight of the evidence, and was contrary to the laws and principals of justice. Motion at 1; Oral Arg. Transcript at 10-11. Although not briefed, during oral argument, defense counsel raised a third ground upon which a new trial is called for--the admission of hearsay during trial. Oral Arg. Transcript at 9-10.

## I. **Plaintiff's Witness List**

Harrelson first claims that he is entitled to a new trial because the witnesses provided for on the Plaintiff's witness lists were not present in Court, despite being identified by Plaintiff. This claim must fail because Harrelson was not entitled to consider the names on Plaintiff's witness lists as witnesses who would definitely be present at trial and called to testify.

The Pretrial Order gives the parties the option of designating each witness as either a "will call" witness or a "may call" witness. Doc. No. 33, ¶ 15. The Order itself explains the distinction:

> [B]oth plaintiff(s) and defendant(s) should separately list the witnesses whom each will have present at the trial and those whom each may have present at the trial . . . . A representation that a party will have a witness present may be relied on by

the opposing party unless notice to the contrary is given in sufficient time prior to trial to allow the opposing party to subpoena the witness or obtain his testimony.

Id. Harrelson concedes, as he must, that the witnesses identified by Plaintiff in the Pretrial Order were all identified as "may call" witnesses. Id. Pursuant to the Pretrial Order signed by Harrelson's first attorney, Plaintiff was not bound to have any witness present in Court.

Harrelson seeks to avoid the clear language of the Pretrial Order by claiming that he was misled by conversations that occurred after the filing of the Pretrial Order and just prior to trial. Specifically, Harrelson shows that when the parties appeared for the November 25, 2008 pretrial conference, Plaintiff submitted a typed witness list as directed by the Court for the convenience of the Clerk. That is true. Harrelson's current attorney argues that a new trial is warranted because Harrelson was misled into believing that the witness list submitted at the pretrial conference was a list of witnesses that Plaintiff promised to have present; in essence a "will call" list. That is false. A cursory review of the transcript from the November 25, 2008 pretrial conference shows that Harrelson was specifically warned that

the witnesses listed by Plaintiff were may call witnesses. A careful review of the transcript shows that he received such a warning three separate times.

The witness list submitted by Plaintiff at the pretrial conference contained the names of seventeen witnesses. Doc. No. 55. That list was significantly pared down from the forty-one witnesses identified by Plaintiff in the Pretrial Order. During the pretrial conference, counsel for Plaintiff stated, in Harrelson's presence: "Your honor, that witness list has seventeen witnesses on it. I am going to represent to the Court that I fully expect to call substantially less than that." Pretrial Conference Transcript at 5. Counsel for Plaintiff went on to state: "A couple of these -- a lot of these are on there sort of out of an abundance of caution kind of thing. But more likely than not, we could have as few as three or four witnesses." Id. The Court then asked Harrelson if there was anybody who he would like to call as a witness who was not on the list. Id. When Harrelson inquired about one of the witnesses included on Plaintiff's pared down list -- Mr. Jim Boyle -- counsel for Plaintiff candidly informed Harrelson that he was "not likely to testify." Id. at 9-10.

Harrelson then asked whether three particular witnesses on Plaintiff's list -- Edward Davis, Danny O'Berry, and Derrell Rountree -- would "definitely be there for sure." Id. at 6. In response, counsel for Plaintiff stated: "I plan to call them, but I am not listing them as will call witnesses. They are may call witnesses." Id. at 7. When the Court asked counsel for Plaintiff whether these witnesses would be present at trial, counsel for Plaintiff stated, in Harrelson's presence: "Some of them may be there. Some of this is going to be some judgment about what the [sic] evidence comes in." Id. Shortly after this exchange, Harrelson asked whether he could call the witnesses on Plaintiff's list if they were not called by Plaintiff. Id. at 9. In response, the Court stated: "You could. But to make sure they come, you need to put them under subpoena." Id. at 10.

After describing the trial process in detail to Harrelson, the Court then stated to Harrelson: "Let's go back to the witnesses. You see their witness list. And I explained to you that anybody on there that you want to make absolutely sure actually comes to the courthouse, you need to subpoena them." Id. at 14-15. The Court then went on to inform

Harrelson how he would go about serving a subpoena on a witness:

> You can obtain subpoenas from the Clerk of Court. You need to have them served on these people, and put the date and time and place and so forth, and have those subpoenas served and have them appear if there is somebody you want to make sure is there, because what they are saying by giving you this witness list is they are just giving you a heads up that these are people that you might see there, but they are not guaranteeing that any of them will be there.

Id. at 15.

The Court recognizes that Harrelson's current attorney had not secured the transcript of the pretrial conference at the time he argued that his client had been misled into thinking that all of the witnesses on Plaintiff's witness list would be present for trial. The transcript of the pretrial conference reveals that no one, other than perhaps Harrelson's current attorney, has been misled. Clearly, carefully and thricely, Harrelson was warned that anyone whose presence he desired should be served with a subpoena.

Between the language used in the consolidated pre-trial order, and the candid statements made during the final pretrial conference, it is clear that Harrelson understood that the witnesses listed on Plaintiff's two witness lists

were not "will call" witnesses and that, if he wished to ensure a particular witness' presence, he would have to issue a subpoena.[1]  Harrelson was represented by counsel when the consolidated pre-trial order was drafted and submitted and, after his counsel withdrew, both the Court and counsel for Plaintiff informed him repeatedly and unequivocally that the witnesses on Plaintiff's lists would not necessarily be present at trial or called to testify.  A new trial is not warranted on Defendant's claim of being misled about the witnesses.

## II.  **Weight of the Evidence**

Next, Harrelson asserts that he is entitled to a new trial because the jury's verdict was contrary to the evidence and the principals of justice.  Although a District Court has broad discretion to grant a new trial based on the weight of the evidence, this discretion is limited.  The Eleventh Circuit Court of Appeals has held that "[m]otions for new

---

[1]  Harrelson added one name only to the witness list he now claims he mistakenly considered to be a list of witnesses who must be present for trial.  It is worth noting that Harrelson did not have that one witness present.  His current attorney explained that there was a valid excuse for her absence -- Harrelson was unable to serve a subpoena on her. That excuse proves too much -- it proves Plaintiff's point. The list was a may call witness list.  There was no guarantee that anyone on it would be present.

trials based on weight of the evidence are not favored" and that "[c]ourts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" <u>United States v. Martinez</u>, 763 F.2d 1297, 1313 (11th Cir. 1985). Specifically, "[t]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." <u>Id.</u> at 1312-13 (quoting <u>United States v. Simms</u>, 508 F. Supp. 1188, 1202 (W.D. La. 1980)). Instead, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." <u>Id.</u> at 1313. <u>See also</u> <u>Jones v. Westside-Urban Health Ctr.</u>, 771 F. Supp. 359, 362 (S.D. Ga. 1991)("To assure that a judge does not substitute his judgment for that of the jury, new trials should be granted on evidentiary grounds when the verdict is against the great -- not merely the greater -- weight of the evidence.").

In this case, sufficient evidence was presented at trial -- both documentary and testimonial -- to support the jury's verdict against Harrelson for fraud and conversion. The testimony presented by Plaintiff shows that in late 2006, while Harrelson was the store manager at the tire store in question, an audit was conducted in order to investigate

financial irregularities and inventory shortages that were occurring at the store. Trial Transcript at 15-16. By the time the audit and investigation was conducted, Harrelson had been the store manager for a little over five years. Id. at 16. As store manager, Harrelson was responsible for ensuring that store inventories were properly maintained. Id. The evidence presented shows that the inventory shortage amounted to $518,596. Id. at 26-27. As a result of this audit and investigation, Harrelson was terminated for mismanagement. Id. at 17.

Mr. Franklin McNees, a senior field auditor for Bridgestone/Firestone, testified at trial that he was called in to conduct the financial audit of Harrelson's store. Id. at 26. Mr. NcNees testified that, after examining the inventory forms from the last two store inventories conducted, he concluded that Harrelson had manipulated the inventory conducted on March 31, 2006. Id. at 29. McNees testified that Harrelson "inflated" the March 31 inventory by including items in the inventory that should not have been included. Id. at 29-32. According to McNees' testimony, without the improperly included items, the March 31 inventory would have reflected a shortage of $518,596. Id. at 32. McNees also

testified that, based on his investigation, he concluded that Harrelson had released unbilled merchandise to various customers over a period of time. Id. at 29. McNees testified that, based on the information that he obtained during his investigation, Harrelson was the only person who could have been responsible for the $518,596 loss. Id. at 33.

Plaintiff also presented the testimony of Mr. John O'Berry, who is the current store manager at the Waycross store. Mr. O'Berry worked at the Waycross store during the time that Harrelson was store manager. Id. at 62. O'Berry testified that, on several occasions, he witnessed Harrelson giving away inventory without receiving payment. Id. at 63-64. O'Berry also testified that when he did "spot-checks" of certain inventory, he noticed a large discrepancy between the number of tires reflected in the store's computer system (the number of tires that should have been present) and the number of tires actually present in the store. Id. at 65. O'Berry testified that there was no record to explain what had happened to the missing tires. Id.

Next, Plaintiff presented a portion of the deposition testimony of Mr. William McAllister. Mr. McAllister testified that it was Harrelson's responsibility, as store manager, to

make sure that the inventory accurately reflected the value that was actually in inventory in the store. Id. at 78-79. When asked why a store manager would overstate the inventory, Mr. McAllister testified that doing so would allow the store manager to make a profit equal to the inventory overage, and would make the store manager look like he was doing a better job than he actually was. Id. at 79. McAllister also testified that, as part of the compensation that a store manager receives, when the store's profitability hits certain levels, the store manager gets additional compensation by way of bonuses. Id.

Plaintiff's next witness was Mr. Mickey Bokor, a salesman at the Waycross tire store. Mr. Bokor was employed as a salesman during the time that Harrelson was the store manager. Id. at 82. Bokor testified that in reviewing the account history of Collins and Sons -- one of the store's regular customers -- he uncovered a gap ranging from September 2005 to August 2006. Id. at 84. According to Bokor, during this eleven month period, there was no record of Collins and Sons purchasing any tires from the Waycross store. Id. However, Bokor testified that Collins and Sons did, in fact, receive tires from the store during this time period. Id. In fact,

Bokor testified that, during the entire eleven month period, Collins and Sons received tires from the Waycross store as frequently as once or twice a week. Id. at 84-85. According to Bokor, it was Harrelson who authorized Collins and Sons to take these tires without paying for them. Id. Bokor also testified that, during his employment, he observed a large discrepancy between the number of tires reflected in the store's computer as being in the store and the number of tires that were actually present in the store. Id. at 85.

Finally, Plaintiff called Ms. Mildred Wilson, the office and credit manager at the Waycross tire store, to testify. Like the other witnesses, Ms. Wilson was employed at the Waycross store during the time that Harrelson was store manager. Id. at 92. Wilson testified that, while Harrelson was store manager, she observed Harrelson instructing store employees to load and deliver tires to two of the store's regular customers -- Collins and Sons and Rimes Logging. Id. at 93. Wilson testified that, to her knowledge, the store was never paid for any of these tires. Id. at 93-94. Wilson further testified that, as credit manager, she has access to all of the store's financial records. Id. at 94. She testified that, based on her experience as credit manager,

while Harrelson was store manager, Harrelson would let inventory leave the store without it ever being paid for on many occasions. Id. In fact, Wilson testified that this occurred "rather regularly." Id. Wilson also testified that, on several occasions, invoices for tires were altered and that it was "possible" that it was Harrelson who altered these invoices. Id. at 94-95. Wilson testified that on one of these altered invoices alone, to Collins and Sons, there was a discrepancy of over $32,000. Id. at 95. Wilson also testified that she observed Harrelson putting tires from the store on to his personal vehicle, and that, to her knowledge, Harrelson never paid for these tires. Id. Finally, Wilson testified that she had knowledge of Harrelson, while store manager, falsifying inventory counts to overstate the store's inventory. Id. at 96-97. Wilson testified that, to her knowledge, it appeared that Harrelson was intentionally falsifying the store's inventory. Id. at 97.

At the trial, Defendant called one witness, Mr. Andy McAllister. Mr. McAllister served as assistant regional manager during the time that Harrelson was store manager at the Waycross store. Id. at 106. As assistant regional manager, Harrelson reported directly to McAllister. Id. On

cross-examination, Mr. McAllister testified that, in his belief, there could not have been an inventory shortage of over $500,000 in a six-month period. Id. at 121. However, counsel for Plaintiff impeached McAllister with his own deposition testimony that was directly contradictory to this trial testimony. Id. at 121-122. In his deposition, read at trial during his cross-examination, McAllister testified that he had no reason to question the accuracy of the inventory shortages that were shown in the audit report, and that he did, in fact, believe that the inventory was short over $500,000. Id. at 122. Plaintiff also read a portion of McAllister's deposition in which McAllister testified that he believed this inventory shortage was Harrelson's ultimate responsibility. Id. While it is not for the Court to decide which version of McAllister's testimony is true, Plaintiff presented sufficient evidence for a jury to conclude that McAllister was not being truthful on the stand.

In addition to the testimony presented at trial, the Court received into evidence one document as Plaintiff's sole trial exhibit. This evidence consisted of a store irregularity report, created by Mr. McNees after conducting his audit. In the report, Mr. McNees states:

> The basis of this irregularity is the finding that Ex-Manager Harrelson manipulated store inventories and released GCR unbilled merchandise, as supported through employee observations and statements provided. Ex-manager Harrelson also replaced the tires on his personal vehicle without payment being tendered, received a kick-back from a vendor, and exchanged GCR merchandise for personal favors from law enforcement.

Plaintiff's Exhibit at 1. The store irregularity report received into evidence shows that the total loss was $518,596. Id. Attached to the report, and also received into evidence, are various employee statements collected by Mr. McNees as part of his investigation. Apart from the statements from Mr. O'Berry, Mr. Bokor and Ms. Wilson, whose statements reflect the information discussed during their trial testimony, the statements of four other individuals were presented into evidence.

The first statement was from Mr. Edward Davis, who served as Service Manager at the Waycross store during the time that Harrelson was store manager. Plaintiff's Exhibit at 4. In his statement, Mr. Davis states that, during the first inventory conducted by Harrelson, Davis observed Harrelson change the count on the variance report for certain types of tires to "artificially inflate the inventory." Id. Mr. Davis

also states that during this initial inventory, and all other inventories since that time, Davis manipulated the inventory count "under the instruction and authorization of Tony Harrelson." Id. Davis also states that, during the March 31 inventory, he was ordered by Harrelson to order a large quantity of tires prior to the inventory being counted, but to make sure the billing did not occur until after the inventory count. Id. Davis states that "[t]his was done to deliberately manipulate the inventory." Id. Mr. Davis then goes on to discuss at least two occasions when Davis falsified sale invoices for tires sold to Collins and Sons, at Harrelson's direction. Id.

The next statement was from Mr. Kevin James, who served as a service employee for the Waycross store during the time that Harrelson was store manager. Plaintiff's Exhibit at 6. Mr. James stated that on one specific occasion, he was told to load several tires onto a truck for Collins and Sons without a written ticket for the order. Id. James also stated that he observed Edward Davis loading tires that had not been paid for onto Collins and Sons trucks at Harrelson's directions, and that he observed Harrelson handing Davis a "wad" of cash after one of these transactions. Id.

Also attached to the store irregularity report was the statement of Mr. Kyle Hayes, a tire changer associate at the Waycross store. Plaintiff's Exhibit at 8. Mr. Hayes stated that, on one occasion in December 2005, he observed Harrelson loading eight large tires into a Collins and Sons vehicle. Id. Hayes stated that he never saw a ticket for these items. Hayes also stated that on another occasion he observed Edward Davis handwriting a ticket for Collins and Sons which was never processed in the store's computer system. Id.

Finally, attached to the store irregularity report was the statement of Danny O'Berry, the warehouse supervisor at the Waycross tire store. Plaintiff's Exhibit at 10. Mr. O'Berry stated that, in April 2006, he was asked by Harrelson to load tires into a Collins and Sons vehicle without a ticket. Id. Mr. O'Berry stated that he refused to do this without a ticket and, a short time later, he observed Edward Davis loading these tires. Id. O'Berry stated that there was never a ticket produced and that it was Harrelson who authorized this transaction. Id.

All of this evidence sufficiently supports the jury's verdict against Harrelson on Plaintiff's claims for fraud and conversion. In Georgia, the five elements of fraud are:

"(1) false representation; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; (5) damage to the plaintiff." Hardy v. Gordon, 146 Ga. App. 656, 657 (1978). Plaintiff presented more than enough evidence to establish all five of these elements. Plaintiff presented several witnesses who testified that they observed Harrelson falsifying sale invoices and inventory reports and that he did so knowingly and with the intention of manipulating and inflating the inventory. Plaintiff also presented more than enough evidence for the jury to find that Plaintiff relied upon these falsified sale invoices and inventory reports and that they did so to their detriment, resulting in a loss to them of $518,596, the amount of the jury's verdict.

Georgia law defines conversion as:

> an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his right; or an unauthorized appropriation. Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion.

Harris v. Gilmore, 265 Ga. App. 841, 842-43 (2004). The evidence presented by Plaintiff at trial was more than

sufficient for a jury to find that Harrelson appropriated numerous tires belonging to Plaintiff without authorization and without receiving payment for those tires. The evidence indicates that some of these tires went to Harrelson's personal use, while Harrelson gave others to friends and customers. The evidence likewise was sufficient for a jury to find that Harrelson wrongfully asserted dominion over Plaintiff's property and that such dominion was inconsistent with Plaintiff's ownership rights.

Accordingly, the evidence presented at trial was more than sufficient to support the jury's verdict in favor of Plaintiff, and against Harrelson, on Plaintiff's claims for fraud and conversion. It goes without saying, then, that the evidence does not preponderate so heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand. <u>Martinez</u>, 763 F.2d at 1313. Therefore, Harrelson is not entitled to a new trial on this ground.

## III. <u>Admission of Hearsay</u>

Finally, although not briefed, at oral argument, counsel for Harrelson asserted an additional ground for granting a new trial: the admission of hearsay during the trial. Generally, when a party does not object to the admission of certain

evidence at trial, that party waives his right to complain about such admissions later. <u>See, e.g.</u>, <u>Judd v. Rodman</u>, 105 F.3d 1339, 1342 (11th Cir. 1997); <u>Typographical Service, Inc. v. Itek Corp.</u>, 721 F.2d 1317, 1320 (11th Cir. 1983). At trial, Harrelson did not raise any objections as to the admissibility of any evidence or testimony.

Although pro se litigants are held to less stringent standards than are attorneys and should be treated with leniency by the Court, "this leniency does not give a court license to serve as <u>de</u> <u>facto</u> counsel for a party." <u>Smith v. Belle</u>, No. 08-14619, 2009 U.S. App. LEXIS 5841, at *10 (11th Cir. March 20, 2009)(unpublished); <u>GJR Invs. v. County of Escambia</u>, 132 F.3d 1359, 1369 (11th Cir. )("Courts do and should show a leniency to <u>pro</u> <u>se</u> litigants not enjoyed by those with the benefit of a legal education. Yet even in the case of <u>pro</u> <u>se</u> litigants this leniency does not give a court license to serve as <u>de</u> <u>facto</u> counsel for a party.").

Throughout the pre-trial process, the Court provided guidance to Harrelson regarding the pre-trial and trial process. As discussed, during the pretrial conference, the Court, in great detail, explained the trial process to Harrelson so that Harrelson would know what to expect. <u>See</u>

-22-

Pretrial Conference Transcript at 3-4 (explaining trial process in general); 6 (explaining cross-examinations); 8-9 (explaining impeachment and admission of evidence); 10 (explaining how to obtain subpoena for witnesses); 10-11 (explaining jury selection); 10-12 (explaining trial process in detail); 14 (explaining courtroom etiquette and demeanor); 14-15 (explaining subpoenas); 16-18 (explaining trial process in detail); 21 (explaining the reading of deposition testimony to jury); 23 (instructing Harrelson on how to call witness' credibility into question); 28 (explaining jury charges) & 29 (explaining subpoenas and examination of witnesses).

Not only did the Court take time to prepare Harrelson for trial, but the Court also granted Harrelson as much leniency as was possible during the trial itself. See Trial Transcript at 25 (giving Harrelson leniency regarding scope of cross-examinations); 37 (instructing Harrelson on how to impeach witness with deposition testimony); 40-41 (instructing Harrelson on how to examine witness); 67-68 (instructing Harrelson on how to refresh a witness' recollection); 125 (explaining closing arguments). As the trial transcript indicates, the Court provided Harrelson with as much leniency

and guidance as it could without becoming his de facto counsel.

True, Harrelson's courtroom presentation was sprinkled with vernacular South Georgia phrases. Nevertheless, Harrelson's defense of himself was notable not for its "David versus Goliath" match-up, but rather for how surprisingly unlike David he was. Harrelson's cross-examinations were crisp and cogent. His courtroom demeanor was more polished than that of some practicing attorneys. His preparation and intelligence surpassed that of any pro se litigant the undersigned has ever encountered. In fact, the Court complemented Harrelson's poise and preparedness on the record, outside of the jury's presence, at the conclusion of the trial. Trial Transcript at 146.

Although the sole trial exhibit presented in this case—the Store Irregularity Report—does, in fact, contain numerous hearsay assertions, Harrelson did not object to this exhibit or any mention of it at any point before or during trial. Harrelson was aware of the contents of this exhibit well in advance of trial. The exhibit was listed in the proposed pretrial order submitted jointly by the parties on March 31, 2008. That proposed pretrial order clearly states that any

objections to documentary evidence must be stated in writing and be filed five days prior to the time of the pretrial conference and that "[i]tems not objected to will be admitted when tendered at trial." Proposed Pretrial Order at 14. Doc No. 33. As noted, Harrelson was represented by counsel at the time the proposed pretrial order was drafted and submitted. Neither Harrelson nor his pre-trial attorney made any objection to Plaintiff's sole trial exhibit at any point prior to trial.

Further, at the pretrial conference, counsel for BFS informed Harrelson that the store irregularity report would be Plaintiff's only trial exhibit and provided Harrelson with a complete copy. Pretrial Conference Transcript at 20. Moreover, as is required by the rules of this Court, Harrelson initialed an actual copy of Plaintiff's sole exhibit at the pretrial conference to acknowledge that he saw the exhibit in full. Id. Importantly, several times throughout the trial, Harrelson himself used and made reference to Plaintiff's exhibit. See Trial Transcript at 34, 36, 38, 42, 44, 49-50 & 56-57. After the jury retired to deliberate, Harrelson inquired whether the jury would know that the statements contained toward the end of the exhibit were not sworn. Id.

at 147.  The Court explained that the jury would receive the exhibit which had been utilized by both sides and admitted without objection.  There was talk about labeling the exhibit as "joint," but the Court rejected that proposal because it was referred to repeatedly throughout the trial as Plaintiff's exhibit.  Id. at 149.

In summary, Harrelson not only failed to object to the exhibit, he also utilized the exhibit repeatedly.  As such, he is not entitled to a new trial based on the admission of hearsay.


**CONCLUSION**

For the reasons stated above, Defendant is not entitled to a new trial.  Therefore, Defendant's motion for a new trial is **DENIED**.  Doc. No. 62.  This case remains **CLOSED**.

**SO ORDERED** this ___7th___ day of May, 2009.


_____
Judge, United States District Court
Southern District of Georgia

-26-